# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS ROSEN, on behalf of plaintiffs and the class members described herein, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| TRANSWORLD SYSTEMS INC., as successor to NCO FINANCIAL SYSTEMS INC., NCO FINANCIAL SYSTEMS INC., now known as EGS FINANCIAL CARE, INC.; and BLITT AND GAINES, P.C., | ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff Thomas Rosen seeks redress from unlawful practices engaged in by (a) Transworld Systems Inc. as successor to NCO Financial Systems Inc. ("Transworld"), (b) NCO Financial Systems Inc., now known as EGS Financial Care, Inc. ("NCO"), and (c) Blitt and Gaines, P.C. ("Blitt"), in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA").

### JURISDICTION AND VENUE

2. Subject matter jurisdiction exists under 15 U.S.C. §1692k, and 28 U.S.C. §§1331 and 1337.

3. Because defendants' collection activities occurred in this District, and because they do business here, personal jurisdiction and venue in this District is proper.

## PARTIES

4. Plaintiff Thomas Rosen lives in Cook County, Illinois.

### Transworld

5. Defendant Transworld is a corporation chartered under California law with offices at 507 Prudential Road, Horsham, Pennsylvania 19044. It does business in Illinois. Its registered agent is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

6. Transworld is a collection agency. It seeks to collect on defaulted consumer debts that were originally owed to others, using the mail, telephone and electronic wire services to do so, all in the general course of trade and commerce.

7. Transworld is a debt collector as defined in the FDCPA.

### NCO

8. Defendant NCO is a Pennsylvania corporation with offices at 507 Prudential Road, Horsham, Pennsylvania 19044. It does, or did, business in Illinois. Its registered agent is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

9. NCO is a collection agency that does business in Illinois, and is licensed as such by the State of Illinois. It seeks to collect on defaulted consumer debts that were originally owed to others, using the mail, telephone and electronic wire services to do so, all in the general course of trade and commerce.

10. Transworld is the successor to NCO. Transworld and its predecessor, NCO, will be referred to as "Transworld / NCO."

11. NCO is or was a debt collector as defined in the FDCPA.

### Transworld / NCO Attorney Networks

12. Transworld manages "Agency and Attorney Networks," which are described on its website (http://www.tsico.com/Services/Agency_Attorney_Network.html) as follows:

> Transworld Systems Inc. is expanding its existing Agency and Attorney Networks with current and new business opportunities. We are extremely proud of our Agency and Attorney Networks which designs and implements cost-effective collection solutions on behalf of clients across the country. We manage a nationwide network through leading-edge technology and the expertise needed to achieve results.
>
> We strive to surpass the growing and complex needs of our clients through the professional services provided by our Agency and Attorney Networks. TSI is currently seeking collection agencies and law firms to support our growing network and expanded business opportunities. TSI has a variety of business opportunities in which we are seeking professional, cost-conscious industry experts to join our Agency and Attorney Networks. The business opportunities contain, although not limited to, the following: healthcare, commercial, student loans, telecommunications, and bank card.

13. Transworld's Agency and Attorney Networks are continuations of virtually identical networks set up by NCO. For example, the Form 10-K annual report filed by NCO's parent company for 2010 said that NCO employees "coordinate and implement legal collection solutions undertaken on behalf of our clients through the management of nationwide legal resources specializing in collection litigation. Our collection support staff manages the attorney relationships and facilitates the transfer of necessary documentation."

**Operation of Transworld/ NCO Attorney Networks**

14. On information and belief, based on affidavits and evidence in *Williams v. NCO Group Inc.*, No. 5:10CV761 (C.D.Cal.), *NCO Financial Systems Inc. v. Daniels Law Offices PC*, No. 1:11CV11035 (D.Mass) and other cases, NCO selects counsel, communicates with counsel, and instructs counsel. The nominal plaintiff in each case (in this case, "National Collegiate Trust 2003 - 1") does not select, communicate with or instruct counsel.

15. As a matter of its standard operating procedure ("SOP"), Transworld / NCO directs

network law firms to not communicate with the nominal plaintiffs:

> NCO will interact directly with the Client. In some instances, attorneys may interact directly with the Client only after a request is made through NCO and the Client approves. Only in urgent situations, the firm, and a Client may make contact providing that NCO has also been informed of the situation. If a Client initiates contact with an Attorney Firm directly, the firm is responsible, for the purposes of inventory control and tracking, to notify NCO of the communication.
>
> ln essence, the Attorney Firm's first point of contact is NCO. All statements, notices, information, etc. will go through NCO. (Attorney Firm SOP v.2.1)

16. Another portion of the Transworld / NCO SOP states that "all communications regarding accounts will be conducted between the Attorney Firm and NCO only." On information and belief, subsequent versions of the SOP were consistent.

17. Law firms hired by Transworld / NCO are expressly informed that they are "required to follow NCO's Network Attorney Standard Operating Procedures."

18. Both Transworld / NCO, and firms in its network, are paid on commission.

19. Transworld / NCO grades network firms in Attorney Report Cards based on "key performance indices" geared to the speed with which judgments are obtained and collected. The indices include such metrics as "Payer Rates," "Suit Rate," "Service Rates," "Judgment Rates" and "Spin" or "Liquidation Rates."

**Blitt**

20. Defendant Blitt and Gaines, P.C., is a consumer collection law firm organized as an Illinois corporation located at 661 Glenn Avenue, Wheeling, Illinois 60090.

21. Blitt and Gaines, P.C., is engaged in the business of using the mails and telephone to collect consumer debts originally owed to others.

22. On information and belief, Blitt is one of the firms in the Transworld/ NCO Attorney

Network, and was hired to collect the debts described herein as such.

23. Blitt is a "debt collector," as defined in 15 U.S.C. §1692a.

### Collection Practices of Transworld / NCO

24. Transworld and its predecessor, NCO, have repeatedly engaged in deceptive and unfair conduct, or permitted such conduct to be used by other agencies working on their behalf, in connection with the collection of debts, as shown by the following:

    a. One of the NCO employees who signed affidavits for National Collegiate cases, Chandra Alphabet, signed an agreement with the Georgia Bar to cease and desist from engaging in the unauthorized practice of law in March 2013.

    b. On July 9, 2013, NCO and related entities entered into a consent judgment in *United States v. Expert Global Solutions, Inc., formerly known as NCO Group, Inc., NCO Financial Systems, Inc., ALW Sourcing, LLC, Transworld Systems Inc.*, 3:13CV2611 (N.D.Tex.), agreeing to injunctive relief and to pay $3.2 million in penalties for improper debt collection practices involving harassment and abuse.

    c. In February 2012, the Attorneys General of 19 states (Alaska, Arkansas, Idaho, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Vermont, and Wisconsin) entered into a settlement with NCO to resolve allegations of deceptive and unfair debt collection practices, under which NCO agreed to pay $575,000 to the 19 states for consumer protection enforcement efforts and an additional $50,000 for each

5

participating state to refund consumers with valid claims.

d. Between 2010 and 2012, NCO signed a series of consent orders with the Minnesota Department of Commerce, involving such conduct as hiring unfit persons.

e. In November 2010, NCO signed a consent order with the Arizona Department of Financial Institutions involving, among other things, unauthorized practice of law.

f. In January 2006, NCO entered into a settlement with the Pennsylvania Attorney General to resolve numerous claims of using false, deceptive, or misleading representations or means and harassment in connection with the collection of debts.

g. In 2004, NCO Group Inc. settled Federal Trade Commission charges that it reported inaccurate information about debtors accounts to credit reporting agencies and paid $1.5 million in civil penalties.

## FACTS

25. Defendants have been seeking to collect from plaintiff alleged private student loan debts, incurred for personal, family or household purposes.

26. In March 2015, defendant Blitt and Gaines, P.C., as attorney, filed suit against plaintiff Thomas Rosen in the Cook County, Illinois, Third Municipal District, on behalf of "National Collegiate Student Loan Trust 2003-1" - case number 2015-M3-1586.

27. The complaint alleges that Thomas Rosen have executed "notes" and that the last payment on each loan was made in October 2007, more than seven years prior to the filing of the

lawsuit. (Appendix A)

28. NCO, and now Transworld, serviced the loan and hired and directed Blitt and Gaines, P.C., to file the collection action.

29. The complete "note" was not attached to the collection complaint. (Appendix A)

30. On information and belief, based upon similar student loan cases, the full document was not in fact a note, but a loan application. (Appendix B)

31. The document does not promise to loan a specified amount of money on specified terms. (Appendix B)

32. The full document states that submission of the request does not create a contract and that the actual loan amount if any may differ from that requested. The actual amount of the loan, if any, and the consumer's acceptance of the terms actually offered, depends on a later course of dealing. (Appendix B)

33. The "Loan Request/Credit Agreement" contains the following language:

A. PROMISE TO PAY: I promise to pay to your order, upon the terms and conditions of this Credit Agreement, the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum, and other charges set forth herein.

B. LOAN; DISCLOSURE STATEMENT:

1. By signing this Credit Agreement, and submitting it to you, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. When you receive my signed Application, you are not agreeing to lend me money. You have the right not to make a loan or lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me along with interest and all other amounts I owe (see Paragraph A). You have the right to disburse my loan through an agent.

2. If you agree to make a loan to me, you will mail me the disbursement check (the "Disbursement Check") and a statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the "Disclosure Statement"). You have the right to disburse my Disbursement Check through an agent. At your option, you may also make any Disbursement Check or co-payable to me and the Cosigner or to me and the School. In addition to other information, *the Disclosure Statement will tell me the amount of my disbursement and the amount of the Loan Origination Fee.* The Disclosure Statement is part of this Credit Agreement. *Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be used by or on behalf of the Borrower without objection will acknowledge receipt of the Disclosure Statement and my agreement to be legally bound by this Credit Agreement.*

3. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice, together with my unused Disbursement Check or, if I have already endorsed and delivered the Disbursement Check to the School, a good check, payable to you in the full amount of the Disbursement Check. In any event, I cannot cancel more than ten (10) days after I receive the Disclosure Statement. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.3, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.) (Emphasis added)

34. The terms on which the loan is to be repaid are also not determinable from the

"Loan Request/ Credit Agreement."

35. Pages 2-3 of the standard form National Collegiate loan document state that the

payment schedule "will be established" or "will be recalculated" or "will be disclosed" in the future:

E. TERMS OF REPAYMENT:

1. Deferment Period- You may, or, if required by applicable law, will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). Statements will be sent to the Borrower at the address shown on your records. I may, but am not required to, make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance at the end of the Deferment Period, as described in Paragraph D.3. Thereafter, the accrued interest will be treated as principal.

2. Repayment Period- The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment

Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.

3. Repayment Terms- My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period- Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe principal, interest, and/or late fees at the end of the Repayment Period. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full in a single payment.

5. Payments- Payments will be applied first to the late fees and other fees and charges, then accrued interest, and the remainder to principal. If I have multiple loans, processed by the servicer, and I submit a single payment that is not sufficient to pay all of the amounts I owe, such payment may be divided between or among the loans in accordance with applicable law and the servicer's customary procedures.

6. Other Charges- If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. I will pay only one late fee for any (monthly) payment, regardless of the number of days it is late. To the extent permitted by

law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

36. The resulting contract is not a note as alleged in defendant's complaint.

37. The resulting contract is not one wholly in writing and therefore it is subject to the 5-year statute of limitations in 735 ILCS 5/13–205. *Portfolio Acquisitions, LLC v. Feltman*, 391 Ill. App. 3d 642, 647, 909 N.E.2d 876 (1st Dist. 2009); (Appendix C)

38. Mr. Rosen appeared in the suit and filed an answer asserting the statute of limitations as a defense. (Appendix D).

39. On August 27, 2015, the collection action was nonsuited. (Appendices E-F)

40. Mr. Rosen spent time and money defending the lawsuit.

## COUNT I – FDCPA

41. Plaintiff incorporates paragraphs 1-40.

42. Defendants violated 15 U.S.C. §1692e, 1692e(2), and 1692e(10) by filing suit on a time-barred debt.

43. Section 1692e provides:

   **a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

   **(2)   The false representation of –**

   **(A)   the character, amount, or legal status of any debt...**

   **(10)  The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

44. Defendants file suit on National Collegiate loan agreements against Illinois borrowers

at the rate of over 125 per month. <u>Appendix G</u> lists the last 1,000 Cook County Municipal Department cases filed on "National Collegiate" debts, filed between December 1, 2014 and August 25, 2015. <u>Appendix H</u> lists Cook County Law Division cases filed on "National Collegiate" debts. <u>Appendix I</u> is a partial list of the "National Collegiate" cases filed Downstate during 2015, listing over 200 cases. Blitt filed at least half of these cases.

45. Defendants frequently file suit on National Collegiate loan agreements where more than five years have elapsed since default, according to the affidavits attached to the complaints.

**CLASS ALLEGATIONS**

46. Under Fed.R.Civ.P. 23(a) and (b)(3), plaintiff seeks relief for a class and subclass.

47. The class includes (a) all individuals in Illinois, (b) who were sued by a "National Collegiate" entity (c) on a document that provides that receipt of a signed application is not an agreement to lend money and that the lender has the right not to make a loan or lend an amount less than the amount requested, (d) where either (i) the affidavit attached to the complaint states that the last payment was made more than five years prior to the date suit was filed or (ii) the affidavit attached to the complaint states that no payments were made, and the date of first payment disclosed on the Truth in Lending statement attached to the complaint is more than five years prior to the date suit was filed, and (e) suit was filed on or after a date one year prior to the filing of this action.

48. The sub-class includes (a) all individuals in Illinois, (b) who were sued by a "National Collegiate" entity (c) represented by Blitt (d) on a document that provides that receipt of a signed application is not an agreement to lend money and that the lender has the right not to make a loan or lend an amount less than the amount requested, (e) where either (i) the affidavit attached to the complaint states that the last payment was made more than five years prior to the

date suit was filed or (ii) the affidavit attached to the complaint states that no payments were made, and the date of first payment disclosed on the Truth in Lending statement attached to the complaint is more than five years prior to the date suit was filed, and (f) suit was filed on or after a date one year prior to the filing of this action.

49. On information and belief, based on the use of form documents and the volume of complaints filed, there are more than 35 class members, and the class is so numerous that joinder of all members is not practicable.

50. There are questions of law and fact common to the members of the class, which predominate over any questions relating to individual class members. The predominant common questions are (a) whether defendants engage in a practice of filing time-barred lawsuits and (b) whether doing so violates the FDCPA.

51. Plaintiff's claim is typical of the claims of the members of the class, as it is based on the same facts and legal theories.

52. Plaintiff will fairly and adequately represent the class members, and has retained counsel experienced in class actions and FDCPA litigation.

53. A class action is superior for the fair and efficient adjudication of this matter, in that (A) individual actions are not economically feasible, (B) members of the class are likely to be unaware of their rights, and (C) Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the court should enter judgment in favor of plaintiff and the class and against defendants for:

    a. Statutory damages;

      b.      Actual damages;

      c.      Attorney's fees, litigation expenses and costs of suit;

      d.      Such other or further relief as the Court deems proper.

            /s/ Daniel A. Edelman
            Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Emiliya Gumin Farbstein
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **NOTICE OF LIEN AND ASSIGNMENT**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

/s/ Daniel A. Edelman
Daniel A. Edelman

## **DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that each defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with any plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, plaintiffs demand that defendants request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendants.

s/Daniel A. Edelman
Daniel A. Edelman